**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**RHONDA P. LEY, Regional**
**Director of the Third Region of**               5:14-cv-775
**the National Labor Relations**                  (GLS/DEP)
**Board, for and on behalf of the**
**NATIONAL LABOR RELATIONS**
**BOARD,**

                              **Petitioner,**

        **v.**

**NOVELIS CORPORATION,**

                              **Respondent.**
_____

**APPEARANCES:**                          **OF COUNSEL:**

**FOR THE PETITIONER:**
National Labor Relations Board            LINDA M. LESLIE, ESQ.
Region Three                              MARY ELIZABETH
Niagara Center Building, Suite 630        MATTIMORE, ESQ.
130 South Elmwood Avenue                  NICOLE ROBERTS, ESQ.
Buffalo, NY 14202                         LILLIAN RICHTER, ESQ.

**FOR THE RESPONDENT:**
Novelis Corporation                       KENNETH L. DOBKIN, ESQ.
3560 Lenox Road, Suite 2000
Atlanta, GA 30326

Hunton & Williams LLP                     KURTIS A. POWELL, ESQ.
600 Peachtree Street NE, Suite 4100       ROBERT T. DUMBACHER, ESQ.
Atlanta, GA 30308

Hiscock, Barclay Law Firm                 EDWARD G. MELVIN, ESQ.
One Park Place

300 South State Street
Syracuse, NY 13202-2078

**Gary L. Sharpe**
**Chief Judge**

## MEMORANDUM-DECISION AND ORDER

### I. Introduction

On June 25, 2014, petitioner Rhonda P. Ley, Regional Director of the

Third Region of the National Labor Relations Board (NLRB), for and on

behalf of the NLRB, filed a petition seeking temporary injunctive relief

pursuant to 29 U.S.C. § 160(j), also known as § 10(j) of the National Labor

Relations Act (NLRA),[1] that includes, among other things, a cease and

desist order, an interim bargaining order requiring respondent Novelis

Corporation to "[r]ecognize and bargain in good faith with [the United Steel,

Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and

Service Workers International Union, AFL-CIO, CLC]," (hereinafter "the

Union"), and an order restoring an employee to a position from which he

was demoted.  (*See generally* Pet., Dkt. No. 1.)  For the reasons that

follow, the petition is granted in part and denied in part.

### II. Background

---

[1] *See* 29 U.S.C. §§ 151-169.

2

"Novelis is a leading producer of rolled aluminum and the global leader in beverage can recycling, traditionally serving clients in sectors including beverage cans, automotive manufacturing, consumer electronics, construction, and packaging." (Dkt. No. 36 at 2; Dkt. No. 43, Attach. 37 at 14-15.) Novelis' largest, wholly-owned fabrication plant, of the eight it maintains in North America, is the Oswego, New York, facility, which employs over 850 employees. (Dkt. No. 43, Attach. 1 ¶ 21; Dkt. No. 43, Attach. 37 at 17.) Of those 850 employees employed at the Oswego facility, 599 comprised the unit and were deemed eligible to vote for unionization in this case. (Dkt. No. 43, Attach. 37 ¶ 19, at 39-41.)

Beginning at end of 2013, employees began to express dissatisfaction with the conditions of their employment with Novelis. In particular, in November, "employees in the Cold Mill stopped working because they were upset over . . . upcoming policy changes affecting holiday pay, overtime and [other issues]." (Dkt. No. 36 at 5; Dkt. No. 43, Attach. 6 ¶ 15.) Jason Bro, one of the Cold Mill managers, and Peter Sheftic, Human Resources Manager, met with these employees regarding their concerns. (Dkt. No. 37, Attach. 35 ¶ 3; Dkt. No. 43, Attach. 6 ¶ 16.) In December, Novelis held its annual wage and benefit meeting; at the

meeting, plant manager Chris Smith announced certain wage increases that were intended to offset the planned loss of Sunday premium pay and other benefits.  (Dkt. No. 65, Attach. 17 ¶ 7.)  After the meeting, Novelis employee Everett Abare contacted Union representative James Ridgeway, and, afterward, decided to "seek union representation."  (*Id.* ¶ 10.)  Eventually, Abare and 368 other employees signed union authorization cards.  (*Id.*; Dkt. No. 65, Attachs. 50-51.)  Record evidence suggests that Novelis management knew about the unionization efforts by January 3, 2014, and that a supervisor was told by one particular employee that "[e]mployees were upset about the changes that were implemented and talking about getting a union" as early as December 18, 2013.  (Dkt. No. 65, Attach. 17 ¶ 15; Dkt. No. 65, Attach. 52 ¶ 8.)

In a letter dated January 7, Ridgeway demanded that Novelis recognize the Union as the exclusive collective bargaining representative and bargain with it as exclusive bargaining representative of the 599-employee unit.  (Pet. ¶ 18(v); Dkt. No. 65, Attach. 5.)  Ridgeway's demand was based on his claim that a majority of employees endorsed the Union.  (Dkt. No. 65, Attach. 5 at 1.)  Novelis declined to recognize the Union, which prompted a secret ballot election.  (Dkt. No. 65, Attach. 6.)  Although

the parties apparently dispute the timing of Novelis' receipt of Ridgeway's letter, (Pet. ¶ 18(v); Dkt. No. 65, Attach. 6), on January 9, Novelis announced that the changes to premium pay and overtime benefits, among other things, would not be instituted as previously planned. (Dkt. No. 65, Attach. 7.)

The facts of the ensuing campaign are disputed, but what follows is apparent from the record. In January and February, high-ranking Novelis officials spoke with employees about the Union, took action regarding union stickers and literature, and enforced, or declined to enforce, certain policies. Ley claims that the interactions, some of which have been transcribed and included in the record, (Dkt. No. 65, Attachs. 8, 11, 12), along with the other conduct, were threatening, coercive, and constituted interrogation or solicitation, and violated NLRA § 8(a)(1). (Pet. ¶ 18(f)-(o); Dkt. No. 1, Attach. 3 at 20-33.) Following the campaigning period, the election was held on February 20 and 21. (Dkt. No. 65, Attach. 2.) Ultimately, 273 employees voted in favor of unionization while 287 voted against it. (*Id.*)

Ley alleges violations of § 8(a)(1) and (3) in connection with the eventual demotion of Abare on or about April 11, 2014. (Pet. ¶ 18(q); Dkt.

No. 1, Attach. 3 at 33-37.)  On that issue, Abare posted the following

comment on Facebook on March 29, 2014:

> As I look at my pay stub for the 36 hour check we get
> twice a month, One worse than the other.  I would just
> like to thank all the **F*#KTARDS** out there that voted
> "NO" and that they wanted to give them another
> chance...!  The chance they gave them was to screw
> us more and not get back the things we lost....!  Eat
> $hit "NO" Voters.....

(Dkt. No. 65, Attach. 14; Dkt. No. 43, Attach. 32 ¶ 6.)  Abare, who was a

crew leader in the Cold Mill Operations and trainer and officer in the Fire

Department and EMT squads, (Dkt. No. 43, Attach. 32 ¶ 8; Dkt. No. 43,

Attach. 35 ¶ 7), was stripped of his leadership positions as a consequence

of his post although he remains a Novelis employee, (Dkt. No. 43, Attach.

32 ¶ 11).

In connection with the foregoing, the Union, which filed a

representation petition with the NLRB on January 13, 2014, (Dkt. No. 1,

Attach. 1 at 1), filed a host of charges of unfair labor practices (ULPs) with

the NLRB between January 27 and May 22, 2014, (*id.* at 2-12).  Following

an investigation by the NLRB, those charges resulted in a complaint of

ULPs, which is currently pending before the NLRB for adjudication.  (*Id.* at

13-31.)  The NLRB thereafter filed the instant petition seeking temporary

relief pursuant to NLRA § 10(j).  (*See generally* Pet.)  While the court has endeavored to quickly adjudicate the merits of the petition consistent with the command of 28 U.S.C. § 1657(a), various motions, including two motions by employees both in favor of and opposed to unionization seeking to intervene, (Dkt. Nos. 29, 51), and a motion by the Union seeking amicus curiae status, (Dkt. No. 8), were filed in this case.  Those motions were denied in their entirety.  (Dkt. Nos. 12, 18, 58.)  Finally, on August 21, the parties appeared for an oral return on the petition at which time they were permitted to elucidate their positions.

### III.  Standard of Review

Section 10(j) of the NLRA provides:

> The Board shall have power, upon issuance of a complaint as provided in subsection (b) of this section charging that any person has engaged in or is engaging in an unfair labor practice, to petition any United States district court, within any district wherein the unfair labor practice in question is alleged to have occurred or wherein such person resides or transacts business, for appropriate temporary relief or restraining order.  Upon the filing of any such petition the court shall cause notice thereof to be served upon such person, and thereupon shall have jurisdiction to grant to the Board such temporary relief or restraining order as it deems just and proper.

In the Second Circuit, a § 10(j) injunction cannot issue unless a two-part

showing is made by the petitioner. *See Mattina ex rel. Nat'l Labor Relations Bd. v. Kingsbridge Heights Rehab. & Care Ctr.*, 329 F. App'x 319, 321 (2d Cir. 2009).  As the Circuit has succinctly explained:

> First, the court must find reasonable cause to believe that unfair labor practices have been committed. [R]easonable cause to support such a conclusion is sufficient, or put differently, a district court does not . . . make a final determination whether the conduct in question constitutes an unfair labor practice.  In determining whether reasonable cause exists, a district court should show [a]ppropriate deference . . . to the judgment of the NLRB, and . . . should decline to grant relief only if convinced that the NLRB's legal or factual theories are fatally flawed.  Second, the court must find that the requested relief is just and proper.  This Circuit has made clear that courts should grant interim relief under Section 10(j) in accordance with traditional equity practice, as conditioned by the necessities of public interest which Congress has sought to protect.  Thus, injunctive relief under § 10(j) is just and proper when it is necessary to prevent irreparable harm or to preserve the status quo.

*Id.* (internal quotation marks and citations omitted).

On the issue of interim bargaining orders, the Second Circuit has provided the following additional guidance:

> "[W]hen the Regional Director makes a showing, based on authorization cards, that the union at one point had a clear majority and that the employer then engaged in such egregious and coercive unfair labor

practices as to make a fair election virtually impossible, the district court should issue a bargaining order under § 10(j). In such a case the election process has been rendered so meaningless by the employer, that the authorization cards are a clearly superior gauge of employee sentiment. A bargaining order then becomes a just and proper means of restoring the pre-unfair labor practice status quo and preventing further frustration of the purposes of the Act."

*Kaynard v. MMIC, Inc.*, 734 F.2d 950, 953-54 (2d Cir. 1984) (quoting

*Seeler v. Trading Port, Inc.*, 517 F.2d 33, 40 (2d Cir. 1975)).

## IV. Discussion

The court cannot concern itself with what the ALJ or NLRB might do when they are called upon to render determinations as the administrative process unfolds.[2] In the end, it is for this court to decide whether the standard for temporary relief under NLRA § 10(j) has been met, and, concomitantly, whether the requested relief is appropriate.

## A. Reasonable Cause

Ley alleges violations of NLRA § 8(a)(1) and (3) based upon a whole series of conduct, some of which is referenced above and all of which is

---

[2] Indeed, the correctness of Ley's argument that she "has reasonable cause to believe that a Circuit Court would enforce a *Gissel* bargaining order" in this case, (Dkt. No. 64 at 4-5), is of no real moment either. If the court had a crystal ball, it would gaze into it for more productive purposes than to see what the Second Circuit will do in this case if and when the time comes.

detailed in her petition.  (Pet. ¶ 18.)  While there are a host of disputed facts, the deferential standard wins the day on the first prong.  The court offers a few observations, however, and notes that reasonable minds could differ regarding some of the factual conclusions drawn by the NLRB.[3]  For instance, Ley's accusation that Novelis misrepresented to the employees that the Union had filed a charge related to premium pay and other benefits, (Pet. ¶ 18(g)(4)), is not so clear given the content of the letter itself, which could be construed to support exactly what Ley claims Novelis lied to its employees about.  The letter, which was drafted by an NLRB investigator, includes an allegation that high-ranking officials announced the restoration of premium pay.  (Dkt. No. 43, Attach. 37 at 82-84.)

Importantly, the potential for an innocent explanation for one action or another, or legal arguments about what may constitute a ULP by Novelis, does not sound the death knell for reasonable cause.  This is true as to all of the arguments raised by Novelis in opposition to the reasonable cause prong, particularly with respect to whether employees were tricked into

_____

[3] The court is also troubled by Ridgeway's affidavit, which was filed in support of Ley's petition.  (Dkt. No. 65, Attach. 3.)  Ley herself refers to the affidavit as partially "not accurate," but, nonetheless, relies on the balance of it to support her request for relief.  (Dkt. No. 65.)  As concerning as it is that Ley has all but admitted a fabrication or embellishment by Ridgeway, it is for the NLRB to resolve credibility issues such as this.  *See Kaynard v. Palby Lingerie, Inc.*, 625 F.2d 1047, 1051 n.5 (2d Cir. 1980).

signing authorization cards.  (Dkt. No. 35 at 7-9.)  Because the court should

show deference to the judgment of the NLRB and only refuse to grant relief

if it is convinced that the NLRB's legal and factual theories are fatally

flawed, *see Mattina*, 329 F. App'x at 321, there is reasonable cause to

believe that Novelis has engaged in or is engaging in ULPs.  For the

benefit of the employees to whom this order will be read, that the court

found reasonable cause for the NLRB's allegations of ULPs does not mean

that Novelis committed or is committing ULPs—that is a question to be

decided by the executive branch of government, through the NLRB, after a

full administrative hearing.

**B.    <u>Just and Proper</u>**

Finding that the first prong is satisfied, the only issue

remaining—elusive as it is—is what relief is just and proper.  Ley seeks an

injunction prohibiting Novelis from:

> (a)    Threatening employees with plant closure if they select the Union as their bargaining representative;
>
> (b)    Threatening employees with a reduction in wages [i]f they select the Union as their bargaining representative;
>
> (c)    Threatening employees with more onerous

working conditions, including mandatory overtime, if they select the Union as their bargaining representative;

(d) Disparaging the Union by telling employees that the Union is seeking to have Respondent rescind their pay and/or benefits;

(e) Disparaging the Union by telling employees that they would have to pay back wages retroactively as a result of charges filed by the Union;

(f) Threatening employees that Respondent would lose business if they select the Union as their bargaining representative;

(g) Threatening employees with job loss if they select the Union as their bargaining representative;

(h) Interrogating employees about their union membership, activities, and sympathies;

(i) Interrogating employees about the union membership, activities and sympathies of other employees;

(j) Coercing employees by asking them how to vote if they do not want the Union;

(k) Threatening employees by telling them that they did not have to work for Respondent if they are unhappy with their terms and conditions of employment;

(l) Prohibiting employees from wearing union

insignia on their uniforms while permitting employees to wear anti-union and other insignia;

(m) Promulgating and maintaining rules prohibiting all postings, distribution and solicitation related to Section 7 activities;

(n) Maintaining a rule that prohibits employees from posting, soliciting and distributing literature in all areas of Respondent's premises;

(o) Selectively and disparately enforcing Respondent's posting and distribution rules by prohibiting union postings and distributions while permitting nonunion and anti-union postings and distributions;

(p) Granting wage and/or benefit increases in order to discourage employees from supporting the Union;

(q) Soliciting employees' complaints and grievances and promising employees improved terms and conditions of employment if they did not select the Union as their bargaining representative;

(r) Demoting employees because they engaged in protected concerted and/or Union activity;

(s) Maintaining and giving effect to its overly broad unlawful social media policy;

(t) Refusing to recognize and bargain with United Steel, Paper and Forestry, Rubber Manufacturing, Energy, Allied Industrial and

Service Workers, International Union, AFL-CIO, the Union, as the bargaining representative of the employees in the appropriate bargaining unit set forth below:

All full-time and regular part-time employees employed by the Employer at its Oswego, New York facility, including the classifications of Cold Mill Operator, Finishing Operator, Recycling Operator, Remelt Operator, Crane Technician, Mechanical Technician, Welding Technician, Remelt Operations Assistant, Hot Mill Operator, Electrical Technician, Process Technician, Mobile Equipment Technician, Roll Shop Technician, Production Process & Quality Technician, Production Process & Quality Specialist, EHS Facilitator, Planner, Shipping Receiving & Packing Specialist, Stores Technician, Maintenance Technician, Machinist, Facility Technician, and Storeroom Agent, excluding Office clerical employees and guards, professional employees, and supervisors as defined in the Act, and all other employees.

(u)  In any like or related manner interfering with, restraining or coercing employees in the exercise of rights guaranteed them under Section 7 of the Act.

(Pet. at 13-15.) Ley also seeks affirmative relief requiring Novelis to:

(a)  Recognize and bargain in good faith with the Union as the exclusive collective-bargaining representative of its employees in the appropriate unit described above;

(b)  Within five (5) days of the order, restore Everett Abare to the position that he previously held at his previous wage and other terms and

14

conditions of employment;

(c) Post copies of the District Court's opinion and order at the Respondent's Oswego, New York facility where notices to employees are customarily posted, those postings to be maintained during the pendency of the Board's administrative proceedings free from all obstructions and defacements; all unit employees shall have free and unrestricted access to said notices;

(d) Grant to agents of the Board reasonable access to Respondent's Oswego, New York facility in order to monitor compliance with this posting requirement;

(e) Within ten (10) days of the date of this order, convene the bargaining unit employees during working time at the Respondent's Oswego, New York facility, at a meeting or meetings at times and places scheduled to ensure maximum possible attendance, whereupon Phil Martens or Chris Smith, in the presence of a Board Agent, will read the District Court's Order to employees, or at Respondent's option, have a Board Agent read the Order in Phil Martens' or Chris Smith's presence;

(f) Within twenty one (21) days of the issuance of the District Court's Order, file with the District Court and submit a copy to the Regional Director of Region Three of the Board, a sworn affidavit from a responsible official of Respondent setting forth, with specificity, the manner in which Respondent has complied with the terms of this decree, including how it has

> posted the documents required by the Court's
> decree.

(*Id.* at 15-16.)

While the court is inclined to order the majority of the relief requested, it is not so inclined to issue an interim bargaining order. Equitable principles compel the denial of that relief, just as they necessitate the remaining requested relief. Each of the three categories of relief is addressed below.

### 1. Interim Bargaining Order

While there is reasonable cause to believe that ULPs were committed, the evidence of ULPs is not overwhelming, or, at least, it is subject to a wide range of interpretation. And the employees in the unit themselves—as evinced by the copious declarations and confidential witness affidavits filed herein, (*see, e.g.*, Dkt. No. 43, Attachs. 2, 4, 5, 7-19, 23-31, 33-34, 36, 38-41, 43-51; Dkt. No. 65, Attachs. 17-19, 52, 54)—are obviously sharply divided over the issue of unionization.[4] It is doubtful that imposing bargaining on Novelis at this juncture is necessary to prevent irreparable harm or to preserve the status quo. Indeed, the irreparable

---

[4] The court recognizes that some of the employee-endorsed documents were created after the alleged ULPs were committed. In any event, the competing submissions demonstrate divergent views about the conduct of Novelis leading up to, during, and after the campaign.

harm inquiry cuts both ways.  On the one hand, if a majority of the employees, free of trickery and false pretenses, authorized the Union to be their exclusive bargaining agent and Novelis committed or is committing egregious ULPs, a bargaining order should issue to restore the status quo as it existed at the time majority status was reached.  *See Kaynard*, 734 F.2d at 954-55.  On the other hand, if there were no ULPs, or violations were mild in nature, and/or a majority of the employees did not intend to authorize the Union to represent them, a bargaining order is inappropriate and the employees in the unit should not have the Union thrust upon them. The serious questions of fact on the issue of whether a clear majority was ever reached[5] gives the court pause and counsels against an interim bargaining order.

2.    *Restoration of Abare to Leadership Positions and Cease and Desist*

Equitable considerations compel the court to order the remaining requested relief.  Simply put, the restoration of Abare to his prior position and an order restraining and enjoining Novelis from engaging in any ULPs

---

[5] The Supreme Court has explained that employees should not be bound by a signed authorization card if their signatures were procured through "words calculated to direct the signer to disregard and forget the language above his signature."  *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 606 (1969).

during the pendency of the administrative process merely serves to maintain the status quo while that process—which, as explained by counsel during the oral return, may be quite lengthy—comes to its natural conclusion.  Other traditional remedies, such as reading and posting this order, are likewise appropriate.

## V.  <u>Conclusion</u>

**WHEREFORE**, for the foregoing reasons, it is hereby

**ORDERED** that Ley's petition (Dkt. No. 1) is **GRANTED IN PART** as follows:

1.  Novelis, its officers, representatives, agents, servants, employees, attorneys, successors and assigns, and all persons acting in concert or participation with it, pending final disposition of the matters involved herein pending before the NLRB, is enjoined and restrained from:

    (a)  Threatening employees with plant closure if they select the Union as their bargaining representative;

    (b)  Threatening employees with a reduction in wages if they select the Union as their

bargaining representative;

(c)     Threatening employees with more onerous working conditions, including mandatory overtime, if they select the Union as their bargaining representative;

(d)     Disparaging the Union by telling employees that the Union is seeking to have Novelis rescind their pay and/or benefits;

(e)     Disparaging the Union by telling employees that they would have to pay back wages retroactively as a result of charges filed by the Union;

(f)     Threatening employees that Novelis would lose business if they select the Union as their bargaining representative;

(g)     Threatening employees with job loss if they select the Union as their bargaining representative;

(h)     Interrogating employees about their union

membership, activities, and sympathies;

(i) Interrogating employees about the union membership, activities and sympathies of other employees;

(j) Coercing employees by asking them how to vote if they do not want the Union;

(k) Threatening employees by telling them that they did not have to work for Novelis if they are unhappy with their terms and conditions of employment;

(l) Prohibiting employees from wearing union insignia on their uniforms while permitting employees to wear anti-union and other insignia;

(m) Promulgating and maintaining rules prohibiting all postings, distribution and solicitation related to Section 7 activities;

(n) Maintaining a rule that prohibits employees from posting, soliciting and distributing literature in all

areas of Novelis' premises;

(o) Selectively and disparately enforcing Novelis' posting and distribution rules by prohibiting union postings and distributions while permitting nonunion and anti-union postings and distributions;

(p) Granting wage and/or benefit increases in order to discourage employees from supporting the Union;

(q) Soliciting employees' complaints and grievances and promising employees improved terms and conditions of employment if they did not select the Union as their bargaining representative;

(r) Demoting employees because they engaged in protected concerted and/or Union activity;

(s) Maintaining and giving effect to its overly broad unlawful social media policy;

(t) In any like or related manner interfering with,

restraining or coercing employees in the exercise of rights guaranteed them under Section 7 of the NLRA.

2. Novelis, its officers, representatives, agents, servants, employees, attorneys, successors and assigns, and all persons acting in concert or participation with it, pending final disposition of the matters involved herein pending before the NLRB, is directed to:

(a) Within five (5) days of this order, restore Everett Abare to the position that he previously held at his previous wage and other terms and conditions of employment;

(b) Post copies of the court's order at Novelis' Oswego, New York, facility where notices to employees are customarily posted, those postings to be maintained during the pendency of the NLRB's administrative proceedings free from all obstructions and defacements; all unit employees shall have free and unrestricted

access to said notices;

(c)    Grant to agents of the NLRB reasonable access to Respondent's Oswego, New York, facility in order to monitor compliance with this posting requirement;

(d)    Within ten (10) days of the date of this order, convene the bargaining unit employees during working time at Novelis' Oswego, New York, facility, at a meeting or meetings at times and places scheduled to ensure maximum possible attendance, whereupon Phil Martens or Chris Smith, in the presence of an NLRB Agent, will read the court's order to employees, or at Novelis' option, have an NLRB Agent read the order in Phil Martens' or Chris Smith's presence;

(e)    Within twenty one (21) days of the issuance of the court's order, file with the court and submit a copy to the Regional Director of Region Three

of the Board, a sworn affidavit from a responsible official of Novelis setting forth, with specificity, the manner in which Novelis has complied with the terms of this decree, including how it has posted the documents required by the court's order.

**ORDERED** that Ley's petition (Dkt. No. 1) is **DENIED** in all other respects; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum-Decision and Order to the parties.

**IT IS SO ORDERED.**

September 4, 2014
Albany, New York

Gary L. Sharpe
Chief Judge
U.S. District Court